**In re Archie Franklin McBROOM, Jr., Debtor.**

**Bankruptcy No. 7–82–01464.**

United States Bankruptcy Court, W.D. Virginia, Abingdon Division.

Aug. 15, 1985.

Robert T. Copeland, Abingdon, Va., for debtor.

Robert E. Wick, Jr., Bristol, Va., for Clarence Braswell.

James E. Nunley, Bristol, Va., Chapter 13 trustee.

## MEMORANDUM OPINION

H. CLYDE PEARSON, Bankruptcy Judge.

Upon further hearing in this Chapter 13 case pursuant to remand, this Court considered the directives in the remand Opinion as follows: (1) that the Court hear and determine the secured status of Clarence Braswell's claim, and (2) although not specifically directed, makes a further finding and conclusion as to good faith which this Court previously had considered and found not lacking.

The first issue to be determined is that of Clarence Braswell's secured status. Clarence Braswell obtained a judgment against the Debtor, Archie Franklin McBroom, Jr., and a corporation the assets of which Braswell had acquired. The judgment was not against Mrs. McBroom, wife of the Debtor. The Debtor presented in

evidence a deed to the real estate upon which Braswell claims a lien, dated November 20, 1968, recorded in the Clerk's Office of the Circuit Court of Washington County, Virginia in Deed Book 441, at Page 127. The deed recites a conveyance to Archie Franklin McBroom, Jr. and Phyllis Odum McBroom, husband and wife, or the survivor thereof. Further in the deed, it recites that the grant is unto the second parties (the McBrooms) for and during the term of their natural, joint lives and, upon the death of either, the fee simple title shall vest in the survivor.

At trial and in the briefs requested by the Court, Braswell does not seriously contend that the deed in question creates an entireties interest which is not subject to the individual debts of the husband or the wife, but only subject to the joint debts of both. *See Vasilion v. Vasilion,* 192 Va. 735, 66 S.E.2d 599. *See,* also, *Ragsdale v. Genesco, Inc.,* 674 F.2d 277 (4th Cir.1982).

Inasmuch as the judgment is docketed in the county which is the situs of the real estate as a liability solely against the Debtor, the claim of Braswell as to this real estate is unsecured. Since there is no contention that Braswell's claim is secured on other assets, the Court must conclude that the claim of Braswell is a general unsecured claim which would share in distribution with other general unsecured claims in this case.

The remand decision, although not specifically directive, indicates that the Court should make further findings as to "good faith" required by 11 U.S.C. § 1325(a)(3).

Upon further hearing of the additional evidence other than that heretofore found and not substantially contradicted in this subsequent hearing, it appears that the Debtor has consented to modification of his plan in the following respect: the Debtor agrees to voluntarily give up any claim to exempt property rights under his Homestead Deed to the sum of $4,396.00, and agrees that said sum will be paid over to the Chapter 13 Trustee for distribution to creditors. Under 11 U.S.C. § 1325(a)(4), the Debtor is entitled to claim proper ex-

emptions in any determination of the value of the Debtor's property which would otherwise be distributed in a liquidation Chapter 7 case.

In addition to the foregoing concession, the Debtor filed with the Court an unaudited C.P.A. analysis and financial statement on the entities claimed by Braswell to be of substantial value as property of the Debtor. This analysis shows that, as to McBroom Insurance Associates, Inc., the value of the Debtor's equity is $535.72. The total equity in the corporation of which the Debtor is a forty per cent (40%) owner at present is $1,339.31. The other corporate entities, McBroom Enterprises and Energy Savers, Inc., reflect no equity value by this Debtor in McBroom Enterprises, wherein the Debtor is one hundred per cent (100%) owner. Energy Savers, Inc., of which Mrs. McBroom is one hundred per cent (100%) owner, has an equity of $755.64. Although a complete audited report and financial statement would have required extensive expenditures, the unaudited report is not otherwise contradicted nor challenged in the evidence.

Evidence was further presented by the deposition of Mrs. McBroom concerning transactions and stock sales from the Debtor. This transaction reflects an infusion of funds in the sum of $500.00 into the insurance company in exchange for stock at a time when the funds were needed for the operation of the business.

The evidence further reflects that, following the entry of the judgment in favor of Braswell, a subordination agreement was entered into between these parties permitting a loan to be placed upon the entireties real estate. The circumstances surrounding the disbursement of funds from the subordinated loan as appears from the subordination agreement do not show any agreed upon disbursement schedule. Braswell obtained a $5,000.00 credit upon his judgment from the subordinated loan, and the remaining funds were used by the Debtor, individually and for the insurance business. Braswell claims that the Debtor's disbursement of funds, all of which was with the agreement of Braswell's counsel and McBroom's counsel, was in

some fashion fraudulent or devious in nature. This Court finds that the subordination agreement does not specify any mode of disbursement; that the subordination agreement was entered into voluntarily by the parties; and that the receipt of the $5,000.00 credited upon the Braswell judgment and the other disbursements did not in any manner contravene the understanding of the parties nor provisions of the subordination agreement.

The thrust of Braswell's argument in this case is that his judgment obtained against the Debtor as a result of fraudulent conduct should not be discharged in this Chapter 13 case. Congress did not include such exception in the Code.

Braswell heretofore has received as a credit upon his judgment the $5,000.00 from the loan and the $6,000.00 note from the sale of the corporate assets, which was the subject matter of the fraudulent judgment. The Plan proposed by this Debtor would credit an additional sum upon Braswell's claim but will not pay same in full.

To determine whether or not confirmation should be granted because of a "lack of good faith", the Court must look to the statute enacted by the Congress which governs Chapter 13 cases under the Bankruptcy Reform Act of 1978. Good faith is not defined. However, bad faith is not presumed. In 29 *Am.Jur.2d*, Evidence, § 168, the author states: "The law presumes in favor of integrity of conduct, the presumption being that an individual intends to do right rather than wrong, and intends to do only what he has the right to do. Generally speaking, in the absence of proof to the contrary, there is a presumption that all men act fairly, honestly, and in good faith. Citing *New York Life Insurance Co. v. Davis*, 96 Va. 737, 32 S.E. 475."

The enactment by the Congress of the provisions of Chapter 13 in the 1978 Act substantially broadened and liberalized the availability of Chapter 13 to debtors. It was the intent and established policy of the Congress that Chapter 13 repayment plans were to be favored over Chapter 7 liquidation plans by debtors with regular in-

come and who qualify therefor. A discussion of the proposed amendment contained in the House Report which accompanied S–658 sets forth the following principles:

"Subsection (b). This amendment clarifies that the character of performance by the debtor envisioned by a chapter 13 proceeding is that the plan will provide payments to creditors consistent with the debtor's ability after account is taken of monthly budgeted personal and family needs. This provision will require the court to determine, as a prerequisite to the confirmation of any chapter 13 plan, not only that the debtor has proposed the plan in good faith and not by any means contrary to law, but that the proposed plan contemplates a 'good-faith' effort by the debtor in terms of the promised future payments as measured by the *ability* of the debtor to make such payments.

"There is a significant difference in focus between the two 'good-faith' tests imposed by section 1325(a)(3), as amended.

"The good-faith proposal of a plan by the debtor envisioned by the first clause of subparagraph 1325(a)(3) is meant to bar the confirmation of a chapter 13 plan where the debtor either does not intend to effectuate the plan as proposed or where the proposed plan, if consumated (sic), would contravene the spirit or purposes of chapter 13. For instance, a debtor is not entitled to the confirmation of any plan a principal purpose of which is to render the debtor incapable of meeting enforceable legal obligations for the support and maintenance of a former spouse or dependent children ...

"[T]he 'good-faith effort' test looks to the present and future ability of the debtor to make payments into the chapter 13 creditors' fund during the course of the plan, while the traditional 'good-faith' test examines the intentions of the debtor and the legal effect of the confirmation of a chapter 13 plan in light of the spirit and purposes of chapter 13 ...

"The 'good-faith effort' test itself is not intended to constitute cause for lengthening the extension period under subsection 1322(c) ...

"It is clear that subsection 1325(a)(6) mandates that the bankruptcy court, through the mechanisms established under subsections 1302(b)(1) and (2) and 1324, is to determine, as a prerequisite to confirmation, that the payments proposed by the plan can be made by the debtor without undue hardship, with due regard for the *primary duty* of the debtor to provide in the future for the reasonable support and maintenance of the debtor and any dependents. The 'good-faith effort' test is to be applied in full recognition of the feasibility requirement imposed by subsection 1325(a)(6).

"Moreover, subsection 1325(a)(3), as amended, neither prescribes nor authorizes the imposition by the court of a requirement that a chapter 13 plan propose any arbitrary minimum percentage or amount to creditors. Instead, it contemplates that the court determine whether the plan proposed in the particular case represents a good-faith effort to settle the claims of creditors to the extent feasible, within the meaning of subsection 1325(a)(6), during the pendency of the proposed extension period as permitted under subsection 1325.

"The purpose of the 'good-faith effort' test of subsection 1325(a)(3) is to prevent the use of chapter 13 composition plans by debtors having a demonstrated ability, but not the willingness, to make whatever payments their particular circumstances reasonably permit over and above their primary obligations to support themselves and their dependents during the extension period. Under these criteria, the circumstances of a given case may require that the court confirm a chapter 13 plan which proposes no dividend whatever to holders of allowed unsecured claims or that the court deny confirmation of a plan proposing a 95% dividend to the holders of such claims."

The Fourth Circuit Court of Appeals dealt with the subject of good faith and its meaning under the Code in *Deans v. O'Donnell*, 692 F.2d 968 (4th Cir.1982). Although the Court was primarily dealing with what had been held by the lower

courts as minimum payment standards reflecting good faith, the Fourth Circuit rejected the amount of payment as the sole criterion and went further to establish a definition of good faith. The Court stated that each case was required to be judged upon its own merits and that certain criteria and standards "checklist" was being established as guidance to the courts, as follows:

"Without attempting either to be exhaustive or to establish a criteria 'checklist', these factors might include, depending on the particular case, not only the percentage of proposed repayment, but also the debtor's financial situation, the period of time payment will be made, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor. Although the court's discretion in making the good faith determination is necessarily a broad one, the totality of circumstance must be examined on a case by case basis in order fairly to apply the statute as now written."

The Court previously had analyzed the legislative history, and set forth as follows:

"All that can be said with certainty about Chapter 13 legislative history is that it presents no definitive answer on this issue and certainly does not compel adoption of a *per se* rule of substantial repayment. To be sure the Senate report does note that under Chapter 13 '100 per cent payment plans will be encouraged' and that it was 'also necessary to prevent Chapter 13 plans from turning into mere offers of composition plans under which payments would equal only the non-exempt assets of the debtor'. S.Rep. No. 989, 95th Cong., 2d Sess. 13, reprinted in [1978] U.S.Code Cong. & Ad. News 5787, 5799. On the same page, however, the Senate envisioned 'new Chapter 13' to permit 'almost any individual with regular income to propose ... a reasonable plan for debt repayment based on that individual's exact circumstances'. *Id.*

"The House Report similarly reflects that intent to provide various debtors in various stages of economic indebtedness with the opportunity to perform promises realistic to their particular situations:

'The purpose of Chapter 13 is to enable an individual, under court supervision, and protection, to develop and perform under a plan for the repayment of his debts over an extended period. In some cases the plan will call for full repayment. In others, it may offer creditors a percentage of their claims in full settlement.'

"H.R.Rep. No. 595, 95th Cong., 1st Sess. 118 (1977), reprinted in [1978] U.S. Code Cong. & Ad.News 5963, 6079.

"There seems in the legislative history a recognition, therefore, that plans offering 100 per cent repayment to unsecured creditors would be called for in appropriate cases. At most, this history suggests a hope that debtors would pay if not in full at least a substantial portion of their unsecured debts. Nowhere is there indication that in order to meet the good faith requirement a minimal amount must be paid in every case as protection to unsecured creditors. Indeed, the abolition of unsecured creditor's consent to the debtor's plan, previously mandated by Chapter XIII, was one aspect of Chapter 13 viewed as essential to hopes for its success. As one proponent of what was enacted suggested:

'We feel that if the debtor makes an effort to repay, his creditors should not be able to say that the plan does not propose to pay enough or it does not do other things the creditor wants.' (emphasis added)

"123 Cong.Rec. H 11699 (daily ed. October 27, 1977).

"Finally, the generally liberalized provisions of Chapter 13 were primarily 'designed to serve as a flexible vehicle for the repayment of part or all of the allowed claims of the debtor', S.Rep. No. 989 at 141, reprinted in [1978] U.S.Code Cong. & Ad.News at 5927. It seems unlikely, for example, that in extending

eligibility for Chapter 13 relief to welfare recipients Congress could have intended simultaneously to inject into the Chapter a requirement that in every case 'substantial' repayments must be made by such debtors to their unsecured creditors.

"Our task is to construe the statute, not to construct it. Rather than manipulating the 'good faith' requirement so as to impose a rigid requirement of substantial repayment in every case we think the proper course is to apply the statute as written and to allow Congress, should it choose, to add additional conditions for the confirmation of Chapter 13 plans."

This Court had occasion to deal with the good faith issue in the case of *In re Thacker*, 6 B.R. 861 (W.D.Va.1980), in which the following was said:

"Many courts seem to have struggled with the term 'good faith' to a point at which the burden upon a debtor to prove good faith is an insurmountable hurdle. In determining the Congressional intent in the application of Chapter 13 it must be remembered that it is a rehabilitative statute to be liberally construed to effect its purpose of rehabilitating a distressed debtor who comes within its terms. It seems inappropriate for courts to search meticulously for factors that may tend to show a lack of good faith in order to deny confirmation. Such construction by the courts is a torture of Congressional intent and of the provisions of Chapter 13 and its traditional purpose under the Bankruptcy Act of 1898, as well as the Bankruptcy Reform Act of 1978. The omission in Chapter 13 of the requirement for acceptance of the plan by creditors would seem to express a Congressional intent to broaden the available remedy to debtors rather than restrict such remedies. Indeed, the jurisdictional requirements qualifying a Debtor for Chapter 13 have been greatly enlarged. There has been liberalization of the requirement as to income, amount of debt and powers of the Trustee and amount of claims of creditors. See 11 U.S.C. §§ 1301, 1302. In 11 U.S.C. § 1322, providing for the contents of a plan, the Congressional intent is crystalized. The provisions thereof provides for modification of secured claims, curing default, classification of claims among others. Therefore, it would seem inappropriate for courts to focus unduly on a question of good faith in a manner which distorts Congressional intent in the interpretation by the courts of the Chapter 13 provisions.

"When Congress enacted the Bankruptcy Reform Act of 1978, it greatly broadened and liberalized the provisions of Chapter 13. New to the 1978 Act were the cram-down provisions of 11 U.S.C. § 1322 and the co-debtor stay provision of 11 U.S.C. § 1301. New also were several significant advantages to a Chapter 13 over straight bankruptcy for the consumer debtor and creditor. See generally Lee, Chapter 13 neé Chapter XIII, 53 Am.Bankr.L.J., 1979, p. 305. Among the distinct advantages other than the co-debtor stay and the cram-down feature, is the debtor's ability to continue to use items of personal property encumbered by a lien while redeeming the property under the plan. See 11 U.S.C. § 1303. Another important advantage available under Chapter 13 is that the debtor may obtain release from nondischargeable, unsecured debts, other than claims entitled to priority or for alimony or child maintenance, by partial payment of claims under a composition plan. See 11 U.S.C. § 1328(a).

"The success or failure of a Chapter 13 debtor to comply with the confirmation order is something the court must consider at a point 'down the road'. Congress provided for this eventually in 11 U.S.C. § 1307(c)(5) in which a Chapter 13 case may be dismissed or converted for 'material default by the debtor with respect to a term of a confirmed plan'. A court should not attempt to project into future circumstances concerning the question of default of the confirmed plan. That matter should be properly heard and determined at a point following confirmation when the plan is not being complied with."

In reviewing the facts surrounding this Debtor's Plan and the objections by Braswell, only one of the creditors herein, it appears that the thrust of the Congressional intent in Chapter 13 cases is that one creditor's objection, because his claim may be tainted by fraud or other circumstances, should not be permitted to prevent confirmation of a Plan which results in some payment to other general creditors which would not be forthcoming under Chapter 7. Indeed, perhaps in this case, creditors would realize no payment whatsoever if the case were a Chapter 7 liquidation. The legislative intent was further magnified in the recent amendments referred to as the *Bankruptcy Amendments and Federal Judgeship Act of 1984* relating to Chapter 13. In these amendments, the availability of Chapter 13 to individuals with regular income was substantially expanded. In 11 U.S.C. § 707(b), the court is charged with the responsibility of dismissing a case filed by an individual debtor whose debts are primarily consumer debts if it finds that granting of relief under Chapter 7 would be an abuse. The thrust of the amendment is that debtors should be required to proceed under Chapter 13 in such cases. Braswell seeks to invoke the opposite result in this case.

This Court having carefully reviewed the evidence in light of the criteria set forth in *Deans v. O'Donnell, supra,* concludes that the Debtor has demonstrated good faith based on his financial condition, the proposed payments, his earning ability, and the claims to be paid, as well as the other facts and circumstances.

The Debtor's financial circumstances presented shows that creditors will receive substantially more than under Chapter 7; that the Debtor's financial condition will provide the proposed payments; that there is no evidence of prior bankruptcy filings; and that confirmation is in the best interests of all creditors.

The Court notes that the $5,000.00 resulting from the subordination agreement complained of was actually payment from assets upon which Braswell held no valid security interest. This Court fails to see where any alleged deviation from the sub-ordination agreement, which, in fact, is nonexistent based on its terms, should be a material consideration as it relates to confirmation of this Debtor's Plan or negates good faith.

Accordingly, confirmation should be granted, and the Trustee will tender a Confirmation Order in accordance with the Debtor's Second Modified Plan for entry by the Court.